Ralph D. SMITH, Appellant (Defendant),

v.

STATE of Indiana, Appellee (Plaintiff).

No. 85S04–9701–CR–27.

Supreme Court of Indiana.

Dec. 29, 1997.

Kristina L. Lynn, Tiede Metz & Downs, P.C., Wabash, for Appellant.

Pamela Carter, Attorney General, James D. Dimitri, Deputy Attorney General, Indianapolis, for Appellee.

ON PETITION TO TRANSFER

SELBY, Justice.

The State challenges the decision of the Court of Appeals which reversed the jury

convictions of Ralph D. Smith ("defendant") for one count of child molesting as a class C felony,[1] and one count of attempted child molesting as a class B felony.[2] The Court of Appeals, with one dissent, reversed his conviction because it concluded that defendant's trial attorney failed to move to suppress and to object to the admission of Smith's confession, which he asserted at trial was coerced, and that this constituted ineffective assistance of counsel. 673 N.E.2d 768 (Ind.Ct. App.1996). We disagree. We conclude that trial counsel's tactical decision to explain rather than to attempt to exclude his confession on voluntariness grounds did not constitute deficient performance; that defendant cannot claim that counsel's performance at trial prejudiced him because he testified at his sentencing hearing, contrary to his testimony at trial, that he in fact had molested his daughter and that his confession was not coerced; and that defendant was not deprived of the effective assistance of counsel within the meaning of the Sixth Amendment of the United States Constitution.[3] Accordingly, we reverse the Court of Appeals and reinstate defendant's convictions.

## FACTS

Pursuant to a plea agreement, defendant initially attempted to plead guilty to child molesting as a class C felony, in exchange for which the State agreed to dismiss the count of child molesting as a class B felony and to recommend a sentence of four years with three years to be suspended, one year to be served at the Wabash County Jail, and three years of probation to be imposed upon such terms and conditions determined by the court. The trial court, however, rejected the proposed plea agreement, and, on September 27 and 28, 1994, the case was tried before a jury which convicted defendant on both counts.

The facts elicited at trial, viewed in the light most favorable to the judgment, are that defendant and his first wife Melanie Hayes were married in May 1990 and had a baby girl ("S.S." or "victim") on September 20, 1990. In April 1991, defendant began dating and having sexual relations with fifteen-year-old Amanda Moorehead, now Amanda Smith, defendant's second wife. Defendant and Melanie Hayes separated in May 1991, and in September 1991, they filed for divorce which was granted in April 1992.

After the couple filed for divorce, the court established a visitation schedule. Defendant had visitation with his daughter every other weekend from Friday evening to Monday, and every other Thursday. Defendant's visitation often took place at the home of Amanda's parents.

Melanie testified that, beginning in March 1992, when her daughter, then approximately eighteen months old, returned from visiting defendant, she was temperamental and would fondle herself. She also would say that she did not want to go back to visit her father, whom she began referring to as "Ralph" instead of "Daddy" because she was mad at him. (R. at 186–88.)

Concerned by this behavior, Melanie met with the Miami County Department of Public Welfare ("DPW") in March 1992, and DPW referred her to Dr. Neil Stalker, a pediatrician who examined the victim for signs of abuse. At that time, he could not say that she had been abused. Nevertheless, the victim continued, with increasing frequency, to display the same type of behavior after visiting her father.

On Sunday, November 22, 1992, following a Thursday visit with defendant, Melanie was attempting to toilet train her daughter. She left the bathroom briefly to answer the phone

1. *See* Ind.Code § 35–42–4–3(b)(1993 & Supp. 1997).

2. *See* Ind.Code § 35–42–4–3(a)(1993 & Supp. 1997)(child molesting); Ind.Code § 35–41–5–1 (1993)(attempt).

3. Absent a clear invocation of a violation of rights under the Indiana Constitution and a cogent supporting argument, we will assume that defendant raises only a claim under the United

States Constitution and will analyze that claim as we would a federal constitutional claim. *Potter v. State*, 684 N.E.2d 1127, 1136 n. 5 (Ind.1997). When performing an analysis of a federal constitutional claim, we are bound by United States' Supreme Court decisions interpreting the United States Constitution. *Games v. State*, 684 N.E.2d 466, 477 (Ind.1997)(citing *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975)).

and when she returned, discovered that her daughter had blood on her hands, thighs and shins. Melanie took her daughter to the emergency room, and once again was referred to Dr. Stalker who examined the victim on November 23, 1992. During that examination, Dr. Stalker discovered scar tissue on the victim's hymen and venereal warts (also referred to as "condyloma acuminata") on her hymen and around her anus. Dr. Stalker testified that the scarring and thickening of the hymen was likely caused by a penetrating injury and was consistent with penetration by a finger. He further testified that venereal warts generally are transmitted through sexual contact with someone who has warts. Although some physicians believe that venereal warts can be contracted from the mother during passage through the birth canal or from contact with the hands of someone who has lesions, Dr. Stalker opined that these possible transmission vehicles were not plausible.

After the incident in November, defendant's visits with his daughter were to be supervised by his mother. Nevertheless, when defendant brought her home from a half day visit on December 26, his mother was not with him. The victim would not allow Melanie's niece to take off her hat or her coat. When Dr. Stalker examined her on December 28, the lips of her genitalia were red, an area of her buttocks was bleeding, and there was swelling around the victim's anus. She told the doctor that "a man had hurt her bottom." (R. at 208–09.)

In January 1993, acting upon a request from DPW, the Indiana State Police began an investigation into the abuse of S.S. Police investigator Robert Brinson interviewed approximately twenty people, and on February 25, 1993, he interviewed defendant at the police post in Peru, Indiana. At the request of the police, defendant left work and drove to the police post for his interview. During the interrogation, defendant signed a form captioned "Advice of Rights—Interrogation," which stated that he had been advised of his constitutional rights and agreed to waive them. (R. at 218.) It also stated that "[n]o promises or threats have been made to me and no pressure or coercion of any kind has been used against me." *Id.* Defendant also gave an audiotape statement in which he acknowledged that first Officer James and then Brinson had read him his rights, that he understood those rights, and that he agreed to waive his rights.

In the taped statement, defendant admitted to two instances in which he had touched his daughter in a sexual manner. Defendant confessed that sometime prior to September 1992, he had touched the victim while giving her a bath at Amanda's parents' house. He stated that he had rubbed the victim's vagina and became sexually excited while doing so. He then inserted his middle finger of his right hand just past the first knuckle into the victim's vagina. He then dressed his daughter, put her in bed, returned to the bathroom, and masturbated.

The second instance occurred the next morning when he changed his daughter's diaper in the bathroom. Defendant stated that he again rubbed the victim's vagina with his finger and hand, and then, while his daughter was standing in front of him and he was on his knees facing her, he rubbed his penis on the victim's vagina by placing his penis between her legs and thrusting with his hips. Defendant then masturbated until he ejaculated while sitting on the toilet with his daughter in front of him. Defendant denied engaging in sexual conduct with his daughter on any other occasions.

After the interview, defendant left the station, and the police subsequently presented the results of their investigation to the prosecutor. On March 31, 1995, the State issued a warrant for defendant's arrest.

Defendant's trial counsel did not move to suppress defendant's confession and did not object to its admission at trial. Instead, counsel put defendant on the stand to explain the circumstances surrounding the confession to the jury. Defendant admitted to giving the statement, but said that it was false and that he did not molest his daughter. He said that he gave the statement because he was intimidated by the police. He explained that he was afraid of the police because, when he was sixteen, a police officer had shot and killed his father. Defendant testified that when he arrived at the police post at about eleven o'clock in the morning, personnel took him to a small room without windows where he was questioned by Sergeant James for

about two to three hours. According to defendant, Sergeant James repeatedly told him that he was not telling the truth when he denied molesting his daughter and also told him that he could not leave. Defendant asked for Brinson, to whom defendant ultimately confessed, and Brinson then proceeded to question defendant.

According to defendant, when he started to look at his watch and at the door, Brinson said, "If you want to leave you have to go through me." (R. at 313.) Defendant testified that he thought that if he left he would have been hurt. He also testified that he spoke to Brinson for about an hour or an hour and a half before Brinson turned on the tape recorder, and that during this initial interview, Brinson told him that if he wanted a lawyer, he could not have one and that a lawyer would just make things harder for him and would make things last longer. Defendant testified that he sat in the room until about four o'clock and left only once to go to the bathroom.

Defense counsel elicited testimony from Brinson that, on the day of his interview, defendant probably was at the police post by eleven o'clock; that Sergeant James interviewed defendant first, with Brinson listening to the majority of the interview from another room, and although this interview lasted until approximately three thirty in the afternoon, defendant made no admissions; and that during Brinson's interview he applied psychological pressure to defendant.

Brinson specifically denied defendant's allegations that he had interviewed defendant for an hour and a half before turning on the tape recorder. He testified that he did speak to defendant before turning on the tape recorder, but only for about ten or fifteen minutes. He testified that he turned the tape recorder on and read defendant his rights at about three thirty that afternoon, as reflected in the transcript of the tape recording and on the rights card that defendant signed, and that he interviewed him in a style which was softer and gentler than James' style and which he had found effective with defendant when he had previously spoken to him. Brinson testified that he did not hear defendant ask James if he could leave, that defendant did not ask Brinson if he could leave, and that Brinson did not say that if defendant wanted to leave he would have to go through him.

To bolster defendant's assertions regarding his fear of the police and his susceptibility to pressure, trial counsel also introduced the testimony of a psychologist who administered intelligence and personality tests to defendant on April 7 and May 18 of 1993. He concluded that defendant has a relatively low I.Q. of 76, which is considered "borderline," and that he was moderately depressed, anxious, and fearful. According to the psychologist, those with defendant's personality type look to others for direction and are easily lead and intimidated.

Defense counsel also elicited testimony suggesting that neither defendant nor Amanda had genital warts, and that there were others with whom the victim may have had contact. These include Melanie's mother and father, with whom Melanie and her daughter lived, as well as her uncle and an animal caretaker, who lived with her parents, and also include those who were with defendant on December 26, that is, Amanda, defendant's half brother, Joe, his sister, Susan, Amanda's father and mother, and defendant's cousin Randy. In addition, defense counsel elicited testimony from doctors who, after conducting examinations of defendant on December 2, 1992 and on September 23, 1993 and of Amanda during her pregnancy from November 1992 through July, concluded that neither defendant nor Amanda had genital warts when examined.[4]

4. Notwithstanding medical testimony relied upon by the defense, the record as a whole, viewed in the light most favorable to the judgment, demonstrates that warts, which are caused by the human papilloma virus, are mysterious, that there are numerous types of this virus, and that there is much that is not known about the virus and genital warts. The gestation period for the virus may vary from one week to two years. The warts themselves may be difficult to detect if they are in the folds of the skin, and there are some

tests for detecting warts that are more sensitive than others. For example, a visual inspection with some magnification, as defendant had in December 1992, may result in the detection of some warts, but an acid wash, as defendant had in September 1993, may make it easier to find the warts. Although wart tissue on one person can cause infection if touched by another person, the virus can be present even if no warts are visible, and a general swab and genetic test may

The jury returned verdicts of guilty on both counts. At the sentencing hearing, when questioned by the court, defendant testified that he was no longer making the claim that he was innocent, that he was not pressured and intimidated into making a false statement, and that he was sorry for everything that happened. The court considered both aggravating and mitigating factors. The court noted, as mitigating factors, that defendant has no prior record and is mildly mentally handicapped, and then sentenced defendant to four years on child molesting as a class C felony [5] and ten years on attempted child molesting as a class B felony.[6] The court ordered the sentences to run concurrently, suspended three years of the sentence, and placed defendant on probation for the suspended portion of the sentence.

## DISCUSSION

The critical issue in this case is whether trial counsel's tactical decision to explain defendant's confession rather than to move to suppress it or to object to it at trial constitutes ineffective assistance of counsel within the meaning of the Sixth Amendment of the United States Constitution. Defendant claimed at trial that his confession was coerced, and that, notwithstanding his confession to the police, he did not molest his daughter. The State at trial introduced facts inconsistent with defendant's version of events surrounding his confession. Later, at his sentencing hearing, defendant admitted that his confession had not been coerced, and that, consistent with his confession, he in fact did molest his daughter. We conclude that trial counsel was not ineffective within the meaning of the Sixth Amendment for failing to challenge the admissibility of the confession as involuntary under the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.[7]

To prevail upon a claim of ineffective assistance of trial counsel, a defendant must show not only that trial counsel's performance was deficient, but also that counsel's performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Potter v. State*, 684 N.E.2d 1127, 1131 (Ind. 1997); *Lloyd v. State*, 669 N.E.2d 980, 984–85 (Ind.1996). To establish the first element of this test, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," or stated another way, that counsel's actions fell below an objective standard of "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 687–88, 104 S.Ct. at 2064–65. *See also Potter*, 684 N.E.2d at 1131. In evaluating counsel's performance, the United States Supreme Court has emphasized that judicial scrutiny must be highly deferential, and that the court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. A defendant must present strong and convincing evidence to prove otherwise. *Potter*, 684 N.E.2d at 1131.

The United States Supreme Court has emphasized that specific guidelines and detailed rules to define reasonable professional assistance are not appropriate and cannot satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant given the facts of a particular case. *Strickland v. Washington*, 466 U.S. at 688–90, 104 S.Ct. at 2064–65. There is, therefore, no specific or *per se* rule governing whether

detect the virus even where there is no visible evidence of wart tissue. Often warts are removed by laser or other medical treatments, but warts also may disappear spontaneously without treatment. The mere fact that the wart is removed or disappears, however, does not necessarily mean that the body is free of the virus. The virus may remain present in the skin, and the warts could recur at a later date.

5. Ind.Code § 35–50–2–6 (1993 & Supp.1997)(providing that the presumptive sen-

tence for a class C felony is 4 years, with not more than 4 years added for aggravating circumstances or not more than 2 years subtracted for mitigating circumstances).

6. Ind.Code § 35–50–2–5 (1993)(providing that the presumptive sentence for a class B felony is 10 years, with not more than 10 years added for aggravating circumstances or not more than 4 years subtracted for mitigating circumstances).

7. *See* note 3 *supra*.

the failure to file motions to exclude evidence or to otherwise object to the admissibility of evidence constitutes deficient performance, *see Kimmelman v. Morrison,* 477 U.S. 365, 383–84, 106 S.Ct. 2574, 2587–88, 91 L.Ed.2d 305 (1986), and there are fact-specific decisions holding that such omissions do not constitute deficient performance[8] and also reaching a contrary result.[9] It is clear, however, that "[i]solated poor strategy, bad tactics, a mistake, carelessness or inexperience" do not necessarily amount to ineffective assistance of counsel "unless, taken as a whole, the defense was inadequate." *Davis v. State,* 675 N.E.2d 1097, 1100 (Ind.1996). *See also Jackson v. State,* 683 N.E.2d 560, 562–63 (Ind.1997); *Fields v. State,* 679 N.E.2d 1315, 1321 (Ind.1997). Moreover, "tactical choices by trial counsel do not establish ineffective

assistance of counsel even though such choices may be subject to criticism or the choice ultimately prove detrimental to the defendant." *Garrett v. State,* 602 N.E.2d 139, 142 (Ind.1992).

◼ To establish the second element of the test, that is, prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and, in this context, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. Stated another way, defendant must show that counsel's errors so undermined the proper functioning of the adversarial process that the trial cannot be

**8.** Cases holding that the failure to file a motion to suppress or to object to the admissibility of evidence did not constitute deficient performance include: *Allen v. State,* 686 N.E.2d 760, 777–78 (Ind.1997)(filing a motion in limine instead of a motion to suppress defendant's admissions not unreasonable where circumstantial evidence of defendant's guilt was consistent with his admissions and where a successful motion in limine arguably would give counsel more control of the evidence than if a motion to suppress had been filed and denied); *Fields v. State,* 679 N.E.2d 1315, 1321 (Ind.1997)(failure to object to statements is not deficient performance where defendant's previous counsel advised him to provide statements, without a written agreement with the State, in the hope of receiving more lenient treatment); *Garrett v. State,* 602 N.E.2d 139, 140–41 (Ind.1992)(reasoning that, after the denial of a motion to suppress confession, counsel cannot be faulted for failing to make an objection "which had no hope of success" and which might have emphasized the admissibility of the statement. in front of the jury); *Young v. State,* 537 N.E.2d 30, 31 (Ind.1989)(holding that failing to move to suppress or object to the videotaped confession of an uneducated nineteen-year-old defendant, where there was no evidence that defendant did not understand the warnings given him and no evidence of any undue pressure on the part of police or any reluctance by defendant to give a statement, was not inadequate performance). *See also Mason v. Godinez,* 47 F.3d 852, 855–57 (7th Cir.), *cert. denied,* 516 U.S. 840, 116 S.Ct. 125, 133 L.Ed.2d 74 (1995)(failure to file motion to suppress evidence from an allegedly illegal search was not deficient performance where such a motion, while arguable, was not clearly meritorious and where overall counsel appears to have mounted an aggressive defense). *See generally Mullins v. State,* 504 N.E.2d 570, 573 (Ind.1987)(reasoning that ordinarily a decision to "explain evidence, rather than exclude it,

is a tactical decision within counsel's reasonable professional judgment"); *Little v. State,* 501 N.E.2d 447, 449 (Ind.1986)(reasoning that ordinarily the decision to file particular motions is one of trial strategy).

**9.** *See, e.g., Pemberton v. State,* 560 N.E.2d 524, 526–27 (Ind.1990)(distinguished in *Allen v. State, supra* note 8). In *Pemberton,* the Court held that counsel's performance was deficient and prejudicial where counsel filed unsuccessful motions to suppress two "show-up" identifications, but then inexplicably failed to preserve the issue for appeal by objecting at trial to these out-of-court identifications and also failed to object to an in-court identification that may have been tainted by the arguably improper prior identifications. The Court apparently viewed the failure to object, not as a tactical decision, but as a default stemming from ignorance of the law on a basic and clearly established legal point. *See also Kimmelman v. Morrison,* 477 U.S. 365, 368–69, 385, 106 S.Ct. 2574, 2579–80, 2588, 91 L.Ed.2d 305 (1986)(reasoning that counsel's performance was deficient where counsel failed to file a timely motion to suppress inculpatory evidence seized from defendant's premises without a warrant, not because of strategy concerns, but because counsel failed to conduct any discovery due to his mistaken belief that the State was obliged to automatically turn over all inculpatory evidence and because he was, therefore, unaware of the inculpatory evidence until the first day of trial). *See generally Smith v. State,* 272 Ind. 216, 219–21, 396 N.E.2d 898, 900–01 (1979)(reasoning the counsel's performance in failing to object to defendant being brought to trial in his jail clothes was deficient because counsel was incapable of carrying out his trial strategy due to his ignorance of the law, that is, his mistaken assumption that an objection would have been futile under applicable law).

relied on as having produced a just and reliable result. *Id.* at 686, 104 S.Ct. at 2063–64. *See also Potter v. State,* 684 N.E.2d at 1131. In certain cases, however, "a different outcome but for counsel's error will not constitute prejudice if the ultimate result reached was fair and reliable." *Games v. State,* 684 N.E.2d 466, 469 (Ind.1997) (citing *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993)). *See also State v. Van Cleave,* 674 N.E.2d 1293, 1298 (Ind.1996), *rehearing granted in part on other grounds,* 681 N.E.2d 181 (Ind.1997), *petition for cert. filed,* (U.S. Oct. 24, 1997)(No. 97–6669). Thus, for example, where the law has changed after defendant's conviction or sentencing in a way that would make it more difficult for defendant to be acquitted or given a severe sentence, *Lockhart v. Fretwell,* 506 U.S. at 369–74, 113 S.Ct. at 842–45, or where defendant's claim of ineffective assistance turns on the use of perjured testimony defendant had hoped to put before the jury, *Nix v. Whiteside,* 475 U.S. 157, 175–76, 106 S.Ct. 988, 998–99, 89 L.Ed.2d 123 (1986), a defendant may not simply rest his claim on the assertion that but for counsel's performance the result of the trial would have been different. Rather defendant must show more fundamentally that the result of the trial is unjust and unreliable. *Lockhart,* 506 U.S. at 369–70, 372, 113 S.Ct. at 842–43, 844.

In applying the two-prong test outlined above, we conclude that counsel's performance was not constitutionally deficient, and that, even if it could be so characterized, defendant cannot make the required showing of prejudice on the facts of this case.

### I. *Deficient Performance Analysis*

■ Defense counsel made a tactical decision to explain rather than to attempt to exclude defendant's confession, and this decision, as well as his overall performance at trial, falls within the wide range of reasonable professional assistance. *See* cases cited at note 8 *supra.* While counsel did not move to suppress the confession or object to its admission at trial, as Judge Friedlander observed in his dissent, 673 N.E.2d at 775, counsel did attempt to convince the jury that at the time he gave the statement, defendant had a legitimate reason to fear the police, that he did in fact fear the police, and that

the officers conducting the interview badgered and intimidated him into confessing. He did so through his cross-examination of Brinson and through the testimony of defendant, who testified among other things, that he was particularly frightened by the police given that his father had been shot and killed by a police officer. To bolster this evidence, defense counsel also called an expert to testify as to defendant's limited mental capacity and susceptibility to pressure. Had defense counsel filed a successful motion to suppress the confession or successfully objected to its admission instead of electing to explain the confession, it may have been more difficult for him to introduce and highlight before the jury the fact that defendant feared the police because a police officer had shot and killed his father. Similarly, it may have been more difficult to highlight defendant's low intelligence.

Defense counsel, through the testimony of defendant and Amanda Smith, the examination of their physicians, and the cross-examination of Dr. Stalker and Melanie Hayes, also attempted to establish that other persons had contact with S.S. during relevant time periods, and that neither Amanda nor defendant had visible genital warts at the times they were examined. It was not unreasonable for counsel to believe that his overall strategy might have rendered defendant a sympathetic figure in the eyes of the jury, and raised a reasonable doubt as to whether defendant, in fact, had molested his daughter. Moreover, although ultimately defense counsel's trial strategy did not prove successful, counsel did succeed in persuading the court to regard defendant's mild mental handicap, which counsel highlighted at trial, as a mitigating factor at sentencing.

■ In reaching a contrary conclusion on the question of counsel's performance and the criticality of filing a motion to suppress or objecting to the confession at trial in this case, the Court of Appeals has both understated the significance of the other evidence of defendant's guilt, 673 N.E.2d at 772, and overstated the importance of potentially exculpatory evidence, 673 N.E.2d at 772 & n. 6. While we do not know and cannot speculate as to how the State would have presented its case in the absence of the confession, certainly at the trial below, the State, in addition to

presenting the confession, presented strong evidence that two-year-old S.S., whose hymen was scarred and thickened and who had genital warts, had been sexually molested. Moreover, each discovery of the physical symptoms of molestation occurred shortly after S.S. returned from visits with defendant. Also, upon her return from these visits, S.S. fondled herself, was temperamental, and said she was angry with "Ralph" and did not want to visit him again. Such evidence of defendant's guilt, though circumstantial, was not insubstantial. The fact that when defendant was examined he had no genital warts was not necessarily exculpatory. A jury could reasonably infer that, while the presence of warts on S.S.'s genitals is the result of sexual molestation, it does not necessarily follow that the absence of warts on defendant's genitals is exculpatory, particularly in light of the fact that his doctor did not perform a genetic test to determine if defendant was carrying the virus which causes genital warts. *See* note 4 *supra.*[10]

Finally, as the majority below concedes, 673 N.E.2d at 774 & n. 9, and as discussed more fully below, it is far from clear on the record before us that, based on the uncontested facts and without considering defendant's testimony at his sentencing hearing, there was a reasonable likelihood that the trial court would have granted a motion to suppress on voluntariness grounds or sustained an objection to the admissibility of the confession if counsel had mounted such a challenge.

Given all of these factors, we cannot say that counsel's overall performance was constitutionally deficient.

## II. *Prejudice Analysis*

■ Because we have determined that counsel's performance was not constitutionally deficient, we need not evaluate the second prong of the test, that is, whether or not counsel's performance prejudiced defendant. *Strickland v. Washington,* 466 U.S. at 687, 697, 700, 104 S.Ct. at 2064, 2069–70, 2071. Nevertheless, we do so here and conclude, as did Judge Friedlander dissenting below, that defendant has not established prejudice. Defendant has not established that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, and he has not and cannot establish that the ultimate result reached at trial was unfair and unreliable. *Games v. State,* 684 N.E.2d at 469 (citing *Lockhart v. Fretwell,* 506 U.S. at 369–70, 113 S.Ct. at 842–43).

■ Regarding the merits of a possible motion to suppress or objection to the admission of the confession on voluntariness grounds, the State at a hearing would have borne the burden of proving the voluntariness of the confession by a preponderance of the evidence, rather than by the beyond a reasonable doubt standard relied upon by the Court of Appeals in its analysis. 673 N.E.2d at 771, 773.[11] In proving the voluntariness of

**10.** To the extent that defendant continues to press the argument made in the Court of Appeals that there was insufficient showing of *corpus delicti* to justify the admission of the confession, we conclude that the argument is clearly meritless. Although we require some proof of a crime to render a confession admissible, this *corpus delicti* of a crime need not be proven beyond a reasonable doubt and may be shown by circumstantial evidence. *Light v. State,* 547 N.E.2d 1073, 1080 (Ind.1989); *Grey v. State,* 273 Ind. 439, 404 N.E.2d 1348, 1350 (1980). Here, as stated above, there was strong evidence apart from the confession that S.S. had been molested as well as circumstantial evidence that defendant committed the crime, and this evidence easily is sufficient to establish *corpus delicti.*

**11.** The United States Supreme Court has held that when a defendant challenges the voluntariness of a confession under the United States

Constitution, the State must prove the statement was voluntarily given by a preponderance of the evidence rather than by the beyond the reasonable doubt standard. *Colorado v. Connelly,* 479 U.S. 157, 167–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986)(voluntariness of waiver of *Miranda* rights); *Lego v. Twomey,* 404 U.S. 477, 488–89, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972)(voluntariness of a confession). *See generally* 16 William A. Kerr, *Indiana Practice, Criminal Procedure* § 7.2f, at 546 & n.31, § 7.2g, at 553–56, § 7.6c at 600 & nn. 3–4 (1991 & Supp. 1997); Joseph G. Cook, *Constitutional Rights of the Accused* § 6:39, at 6–261 to 6–264 (3d ed. 1996 & Supp.1997). *See also United States v. Gillespie,* 974 F.2d 796, 799–800 (7th Cir.1992). Indiana courts have cited to and applied different standards when evaluating voluntariness issues. *Compare Linthicum v. State,* 511 N.E.2d 1026, 1030 (Ind.1987)(preponderance of evidence) *and Ramirez v. State,* 153 Ind.App. 142,

the confession and outlining the totality of the circumstances surrounding the confession, the State could have pointed to the fact that defendant drove to the police station voluntarily, that he was read his rights twice and signed a statement acknowledging that he read and was voluntarily waiving his rights, that he was not formally charged with a crime or placed under arrest, that he left the station after giving his statement, and that, in his statement, defendant gave a number of details of his crimes without being lead. For example, when asked the following simple questions, defendant volunteered the following details:

RB: Okay, now explain—for the record, when you say you used your penis, what'd you do with your penis, what'd you do with your penis?

RS: I rubbed it against her.

RB: And where was she at when you did that?

RS: She was standing in front of me.

RB: And how were you positioned?

RS: On my knees.

RB: And exactly how are you talking about you rubbed her vagina with your penis?

RS: She was standing up while I was on my knees and I just rubbed across the top.

(R. at 220, Ex. 3 at 11–12.)

At a hearing, defendant would rely, in large part, on several uncontested facts—that defendant was questioned at the police station for approximately four to five hours, and that he has a limited mental capacity, is susceptible to pressure, and fears police officers—as well as on the disputed fact that Brinson told him he could not leave the station. With regard to the length of the interviews and defendant's asserted mental limitations, challenges of similar interviews of defendants who had mental limitations have not resulted in a finding that their confessions were involuntary.[12] In fact, the United States Supreme Court specifically held in *Colorado v. Connelly,* 479 U.S. 157, 165–66, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986), that mere examination of the confessant's state of mind, even where defendant is delusional, can never conclude the due process inquiry, and that, unless the police knew of defendant's mental state and susceptibility to police coercion at the time of the interrogation, suppressing the confession would serve

146–47, 286 N.E.2d 219, 221–22 (Ind.Ct.App.1972)(citing to *Lego* preponderance of evidence standard) *with* the following cases that cite to or apply the beyond the reasonable doubt standard: *Houchin v. State,* 581 N.E.2d 1228, 1231 (Ind.1991); *Johnson v. State,* 513 N.E.2d 650, 651 (Ind.1987); *Ortiz v. State,* 265 Ind. 549, 553, 356 N.E.2d 1188, 1191 (1976); *Magley v. State,* 263 Ind. 618, 626–27, 335 N.E.2d 811, 817 (1975); *Burton v. State,* 260 Ind. 94, 105, 292 N.E.2d 790, 797–98 (1973); *Stanger v. State,* 545 N.E.2d 1105 (Ind.Ct.App.1989). Under *Lego v. Twomey* and *Colorado v. Connelly,* the standard which we are bound to apply when interpreting a federal constitutional claim that a confession was not voluntarily given, is the preponderance of the evidence standard. *See* note 4 *supra.* To the extent that *Burton* and *Magley* and their progeny hold that another standard is applicable under federal law—and only to that extent—we hereby overrule and disapprove those cases.

12. *See, e.g., Light v. State,* 547 N.E.2d at 1079 (holding that defendant's mental slowness and the fact that he had been interrogated for four hours, did not render his confession involuntary; reasoning that in most cases where the confession was held involuntary, the interrogation lasted for a matter of days, not hours, and that defendant had sufficient intelligence to pass a driving test and hold a job); *United States v. Montgomery,* 14 F.3d 1189, 1195–96 (7th Cir.1994)(holding that seven hours of interrogation of a defendant assumed to be of limited capacity due to a cocaine addiction, would not support a finding that defendant's statement was coerced). *See also Haviland v. State,* 677 N.E.2d 509, 515 (Ind.1997)(holding that the fact that police pressed defendant to continue with his statement although defendant wanted to stop and that defendant had a low level of intelligence, did not render his confession involuntary); *Brewer v. State,* 646 N.E.2d 1382, 1385 (Ind.1995)(holding that the fact that defendant was under the influence of drugs and severely mentally ill was insufficient under the totality of the circumstances to require the exclusion of his statement); *Pettiford v. State,* 619 N.E.2d 925, 928 (Ind.1993)(holding that, although a person's mental condition is relevant to the issue of susceptibility to police coercion, where the person makes a confession without police coercion, the confession is not rendered involuntary by virtue of the fact that defendant was under some mental delusions at the time of the confession). *But see Mincey v. Arizona,* 437 U.S. 385, 396–402, 98 S.Ct. 2408, 2415–19, 57 L.Ed.2d 290 (1978)(confession held involuntary where defendant, who repeatedly requested a lawyer, was subjected to four-hour interrogation while incapacitated and sedated in an intensive-care unit).

no purpose in enforcing constitutional guarantees. Stated another way, a defendant's mental state is not enough to render a confession inadmissible in the absence of coercive police activity. Here, defendant has made no claim that the police who interrogated him knew that he was slow or unusually susceptible to pressure.

With regard to disputed assertions, such as defendant's assertion that Brinson would not permit him to leave the station, this Court previously has reasoned that similar disputed or contradictory factual assertions make it difficult to conclude that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. *See Davis v. State,* 675 N.E.2d 1097, 1101 (Ind. 1996); *Long v. State,* 582 N.E.2d 361, 363 (Ind.1991).

Thus, while we cannot say that, in light of the arguments that could have been made at a suppression hearing as outlined above and in light of the other circumstantial evidence of defendant's guilt, an effort to suppress or exclude defendant's confession certainly would have failed, it is nevertheless apparent that defendant cannot demonstrate that there is a reasonable probability that challenging the admissibility of the confession on voluntariness grounds would have led to its exclusion and defendant's acquittal. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. For this reason alone, defendant cannot establish prejudice. The contrary decision below rests on the erroneous assumption that it is enough that the defendant establish that challenging the admissibility of the confession "would not have been futile." *Smith,* 673 N.E.2d at 774 n. 6.

In this case, however, there is a more fundamental and compelling reason why defendant cannot establish prejudice. When questioned by the court at his sentencing hearing, defendant testified that he was no longer claiming that he did not molest his daughter, and that he was not pressured and intimidated into making a false confession. As such, defendant admitted that his trial testimony to the contrary was not truthful. Having made this admission, defendant cannot now on appeal make a credible argument that the result of his trial was unjust and unreliable. Defendant cannot establish that he was prejudiced by his trial counsel's performance. *See Lockhart v. Fretwell,* 506 U.S. at 369–70, 372, 113 S.Ct. at 842–43, 844; *Nix v. Whiteside,* 475 U.S. at 175–76, 106 S.Ct. at 998–99. To hold otherwise would be to permit defendant to base his ineffective assistance of counsel argument on a false claim. Such a result cannot be countenanced. *See Nix v. Whiteside,* 475 U.S. at 175–76, 106 S.Ct. at 998–99.

## CONCLUSION

Because defendant cannot establish that his counsel's performance was deficient or that he suffered prejudice, his ineffective assistance of counsel claim must fail. We reverse the Court of Appeals' decision to the contrary and reinstate defendant's convictions.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.